IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

LOANNIE MANGUAL                                                                              PLAINTIFF

V.                              Civil No. 2:22-cv-02101-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration                                                               DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Loannie Mangual ("Mangual"), brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.      Procedural Background

Mangual protectively filed her application for DIB on December 12, 2018, alleging disability since February 17, 2018, due to neck impairments and neuropathy. (ECF No. 10, pp. 62-63, 75, 144-157, 163, 182-183, 201-202). The Commissioner denied her application initially and on reconsideration, and an administrative hearing was held telephonically on August 19, 2020. (*Id*. at 33-59). Mangual was present for the hearing and represented by counsel.

On her alleged onset date, she was 49 years old and possessed a high school education with two years of college credit. (ECF No. 10, pp. 31, 279). She had no past relevant work ("PRW") experience. (*Id*. at 24, 164, 203-210).

On August 28, 2020, an Administrative Law Judge ("ALJ"), Elisabeth McGee, issued an unfavorable decision, identifying December 31, 2022, as Mangual's date last insured.  (ECF No. 10, pp. 16).  She found Mangual's mild degenerative disc disease ("DDD") of the cervical spine with a small disc protrusion, DDD of the lumbar spine, and depression to be severe impairments. (*Id*. at 17).  The ALJ concluded that Mangual did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.).  Despite her impairments, the ALJ determined that Mangual retained the residual functional capacity ("RFC") to perform light work with occasional overhead reaching, use of ramps/stairs/ladders/ropes/scaffolds, balancing, stooping, kneeling, crouching, and crawling and work involving simple, routine, and repetitive tasks.  (*Id*. at 18-19).  With the assistance of a vocational expert ("VE"), the ALJ ultimately decided there were jobs that exist in significant numbers in the national economy that Mangual could perform, including school bus monitor, public area attendant, and photo finishing counter clerk.  (*Id*. at 25).

On May 27, 2022, the Appeals Council denied Plaintiff's request for review.  (ECF No. 10, pp. 5-10).  Mangual subsequently filed her Complaint to initiate this action.  (ECF No. 2). Both parties have filed appeal briefs (ECF Nos. 12, 14), and the matter is ripe for resolution.  The case has been referred to the undersigned for Report and Recommendation.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support

it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder only

considers the claimant's age, education, and work experience in the light of her RFC if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### III. Pertinent Medical Evidence

The record contains evidence dating back to at least October 2015, documenting Mangual's treatment for diabetic neuropathy in her hands and feet and chronic neck and back pain. (ECF No. 10, pp. 244-252, 357-363, 466-472, 479-482, 712-721, 735-736). Exams consistently documented tenderness in the paralumbar muscles and posterior neck, and x-rays of her cervical spine taken in March 2017 revealed a mild curvature abnormality, likely due to muscle spasm, and anterior spurring at the C4-5 and C5-6 levels. (*Id*. at 355, 464, 722). To combat her symptoms, Dr. Charles Craft prescribed medications to include Medrol, Meloxicam, Gabapentin, Lyrica, Fioricet, and Cyclobenzaprine, as well as diabetic shoes and socks and physical therapy. She received the best results from manual therapy and popping. (*Id*. at 483-493).

On August 8, 2017, MRIs of her cervical and lumbar spine showed a small disc protrusion at the C5-6 level, a disc desiccation and bulge at the L2-3 and L3-4 levels, and mild narrowing of the left exit foramen at the L2-3 level. (ECF No. 10, pp. 254, 255, 343, 345, 452, 454). She also had an incidental small Tarlov cyst[1] at the S2 level.

Mangual began treatment with a chiropractor, Dr. Evan Rowe, on August 22, 2017. (ECF No. 10, pp. 495-517). She rated her neck, shoulders, and lower back pain as a 6 on a 10-point scale, explaining that it was aggravated by prolonged sitting, prolonged standing, walking, and lifting. At the time of evaluation, Mangual was visibly uncomfortable; she had difficulty changing

---

[1]Tarlov cysts are fluid filled sacs that form at the bottom of the spine. *See* Tarlov Cyst Disease Foundation, *Tarlow Cyst Information*, *at* https://www.tarlovcystfoundation.org/info/ (last accessed June 9, 2023). Because they contain dilated nerve root sheaths and cerebrospinal fluid, they can cause symptoms to include chronic pain; paresthesias; weakness and/or cramping in the legs, feet, arms, and hands; bowel or bladder changes; swelling; headaches; and dizziness and problems with equilibrium, sciatica, and restless leg syndrome. *Id*.

positions; and she experienced discomfort and burning with range of motion, as well as tenderness to palpation in the affected areas. Dr. Rowe diagnosed cervicalgia, segmental and somatic dysfunction of the cervical/thoracic/lumbar/and sacral regions, pain in the thoracic spine, and low back pain. Records document some initial improvement post treatment.

In November 2017, at Mangual's request, Dr. Craft penned a letter to her employer indicating she should avoid stooping, bending, and lifting due to cervical and lumbar disk disease with radicular pain confirmed on MRI. (ECF No. 10, pp. 335-338, 444-447, 728-731).

Treatment notes dated March 8, 2018, indicate neither the physical therapy nor the chiropractic treatments provided long-term pain relief. (ECF No. 10, pp. 327-330, 433-436, 732-734). And, Mangual had lost her job due to work restrictions. She complained of pain in the neck and upper back; pain in the shoulders with weakness, tingling, and an impaired range of motion; pain and burning in the feet with a loss of sensation; and headaches, rating her pain as a 7/10. On exam, Mangual exhibited tenderness in the paralumbar muscles and posterior neck with a limited range of motion. Monofilament testing also confirmed hypesthesia. Dr. Craft prescribed a trial of Lyrica, as she had received no improvement with Gabapentin, and Meloxicam; recommended diabetic shoes; and referred her to Dr. Natalie Strickland for pain management.

Four days later, Dr. Strickland evaluated Mangual. (ECF No. 10, pp. 608-610, 748-752). Flexion and extension of her head caused neck pain, which she rated as a 4/10. The range of motion in her neck was slightly limited, with pain radiating into her head and shoulders, right greater than left. Mangual exhibited muscle spasms, myofascial pain to palpation, and trigger point tenderness in the paraspinal and trapezius muscles. Heat and ice were only somewhat helpful in alleviating her pain. Dr. Strickland diagnosed myofascial pain, chronic neck pain, disc protrusion, trigger points, and muscle spasms, for which she noted conservative treatment had

failed. She prescribed Parafon Forte and performed trigger point injections on March 26, 2018. (ECF No. 10, pp. 260-261, 607-608, 753). When these did not provide relief, Dr. Strickland administered a cervical epidural steroid injection ("CESI") at the cervicothoracic junction (the C7-T1 level) on April 19, 2018. (*Id*. at 522-526, 605-606, 737-740, 754).

One week later, Mangual returned to Dr. Craft for complaints of neuropathic pain in her feet, chronic neck pain, myofascial pain, and muscle spasms. (ECF No. 10, pp. 276, 375-376, 604, 755). The Gabapentin prescribed in early March had not been particularly helpful, and the Venlafaxine was discontinued due to aggravation headaches, elevated blood pressure, and dizziness. On exam, Mangual exhibited a sensory deficit in both feet with paresthesias, numbness, tingling, and pain. After assessing bilateral neuropathic foot pain, Dr. Craft prescribed Requip and continued the Gabapentin and other routine medications. He also advised her to monitor her blood pressure for reevaluation in one month.

On June 7, 2018, Mangual reported that the neck pain kept her awake at night, and the CESI had provided only minimal relief. (ECF No. 10, pp. 277, 377-378, 602-603, 756). Labs revealed elevated triglycerides and liver function tests, as well as elevated blood sugar. Dr. Craft assessed chronic cervical pain unrelieved with CESIs and ordered an abdominal ultrasound that confirmed fatty liver disease with hepatomegaly and a trace of gallbladder sludge. (*Id*. at 317-318, 423-424, 527-529, 602, 640-641). He then prescribed Vitamin D, Tramadol, moist heat for her neck pain, and a low carbohydrate diet for weight reduction.

A repeat cervical spine MRI, dated July 9, 2018, showed disc bulge at the C4-5 and C6-7 levels as well as disc bulge, protrusion, and anterior spurring at the C5-6 level. (ECF No. 10, pp. 262, 320-322, 426-428, 532-535, 638-640).

On August 16, 2018, Mangual conferred with neurosurgeon, Dr. C. J. Baird, at the Oklahoma Spine and Brain Institute. (ECF No. 10, pp. 690-692). Her neck pain, which she consistently rated as a 4-5/10, continued to interfere with her sleep. An exam revealed palpable cervical tenderness but was otherwise unremarkable. Dr. Baird diagnosed mild cervical DDD at the C5-6 level, neck pain, and diabetic neuropathy and prescribed medial branch blocks. Although Mangual had no current activity restrictions, he advised her to exercise care when bending, lifting, or twisting.

Approximately two weeks later, Mangual's neck and back pain continued to impact her daily function. (ECF No. 10, pp. 278, 600-601, 757). An exam revealed her to be alert and cooperative with some paracervical tenderness in the neck and back area. Dr. Craft assessed chronic neck, back, arthritis, and neuropathy type pain, hypertension, hyperlipidemia, gastritis, and restless leg syndrome. He recommended that she return to the pain specialist; prescribed Lisinopril for hypertension and Pravastatin for hyperlipidemia; indicated some weight loss would be beneficial for both of her current complaints, as well as joint preservation in the future; and continued her other medications.

Dr. Strickland administered cervical medical branch blocks at the C5, C6, and C7 levels on October 4, 2018. (ECF No. 10, pp. 270, 536-540, 598-600, 741-743). When she followed-up on October 19, 2018, Mangual reported 90 percent pain relief, but lasting only a few days. (*Id*. at 596-597, 744-745, 758). Therefore, Dr. Strickland administered a second round of medial branch blocks on November 8, 2018. (*Id*. at 541-545, 593-595, 746-747, 759). Thereafter, Mangual acknowledged 80 percent pain relief, prompting Dr. Strickland to proceed with cervical facet denervation radiofrequency at the C5, C6, and C7 levels. (*Id*. at 547-551, 591-593). However, during a follow-up with Dr. Craft on December 18, 2018, Mangual reported no significant long-

7

term pain relief from the CESIs.  (*Id*. at 279-280, 380-381, 589-590).  And, on January 30, 2019, she denied a significant long-term benefit from the radiofrequency ablation.  (*Id*. at 584-586).  Of all the procedures she had undergone, however, she indicated that the CESIs provided the most pain relief for the longest time.  Two weeks later, Dr. Strickland repeated the CESIs.  (*Id*. at 555-560, 582-584).

On February 22, 2019, Mangual maintained that the Gabapentin was not particularly helpful.  (ECF No. 10, pp. 386-387, 581-582).  And, while the Lyrica worked well, her insurance was unwilling to cover it.  Accordingly, Dr. Craft gave her Lyrica samples and attempted to get her enrolled in one of the charitable prescription assistance programs.  He also noted that her physical problems had caused some depression.  Thus, samples of Flector patches and a prescription for a trial of Wellbutrin were also provided.

Dr. Strickland administered additional CESIs on April 4, 2019, which were not particularly effective.  (ECF No. 10, pp. 561-565, 576-581).  Mangual continued to complain of pain in her neck, scapula, and right shoulder, which she rated as 7/10.  Dr. Strickland advised that she had nothing else to offer her.

In August 2019, Dr. Jeremy Saul, a non-examining physician consultant, reviewed the record and concluded Mangual could perform a full range of light work.  (ECF No. 10, pp. 768-769).

Dr. Joseph Miller, an interventional pain specialist, evaluated Mangual in October 2019. (ECF No. 10, pp. 762-763, 773).  She reported neck pain that radiated into her head and shoulders; back pain; muscle weakness; numbness; headaches; and depression.  The pain was worse with lifting or extending her arms and intensified as the day went on.  It also interfered with her ability to sleep and exercise.  Dr. Miller prescribed cervical facet steroid injections ("CFSI") at a level

higher than the previous CESIs, the first of which he administered 11 days later. (*Id*. at 764-765). Dr. Miller also prescribed Tizanidine, stretching exercises, and Diclofenac topical gel. (*Id*. at 764-765, 772). When he checked in with Mangual by phone on November 14, 2019, she reported complete pain relief for four days following the CFSIs and the ability to be more active. (*Id*. at 766-767). She would later report receiving about 70 percent relief for one week following the injection, but the pain ultimately returned. (*Id*. at 768-771).

Dr. Clarence Ballard, another non-examining physician consultant, affirmed Dr. Saul's assessment of light work after an independent review of the record on November 5, 2019. (ECF No. 10, pp. 82-83).

In August 2020, Dr. Craft completed a medical source statement. (ECF No. 10, pp. 776-779). He indicated Mangual was limited to sitting 1/3 of the day and standing/walking for a total of one hour each with extra breaks and the option to sit/stand at will. Dr. Craft also opined she could lift and carry up to 10 pounds occasionally, but never more than 20; never work overhead, squat, crawl, crouch, kneel, or climb; occasionally push and pull; and infrequently work in an extended position, work overhead, reach, handle, finger, bend, stoop, and balance. Further, he recommended complete avoidance of unprotected heights, machinery with mechanical moving parts, vibrating tools, exposure to extremes and sudden or frequent changes in temperature and/or humidity, exposure to respiratory irritants, and exposure to high noise levels. Dr. Craft also assessed her mental limitations, noting she would be particularly limited in her ability to deal with work stresses, demonstrate reliability, maintain regular attendance, complete a normal workday or workweek, and perform at a consistent pace without an unreasonable number of rest periods. (*Id*. at 781-784).

## IV. Discussion

On appeal, Mangual raises the following issues: (1) whether the ALJ properly found her neuropathy to be a nonsevere impairment; (2) whether the ALJ's RFC is supported by substantial evidence; and (3), whether she can perform the jobs identified by the vocational expert and adopted by the ALJ. After reviewing the record, the undersigned agrees that the ALJ's step two and step five determinations are erroneous.

At step two of the sequential evaluation process, a claimant has the burden of providing evidence of functional limitations in support of their contention of disability. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id*. (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id*. (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)). A step two finding of a non-severe impairment does not, however, end the ALJ's duty to consider the impairment. When a Plaintiff has multiple impairments, the ALJ is required to consider the combined effect of those impairments "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. The ALJ's RFC determination must be based on all relevant evidence in the record, including medical records, observations of treating physicians and others, limitations resulting from factors such as pain, and the claimant's own descriptions of her limitations. *Id*. § 404.1545(a)(3); *see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010), and *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). In assessing RFC, the ALJ must consider limitations resulting from all an individual's

impairments, even those found to be non-severe. *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, (S.S.A. 1996) 1996 WL 37418, *5. Although a non-severe impairment, standing alone, may not significantly limit an individual's ability to do basic work activities, when considered with other impairments, it may well be critical to the outcome of the case. *Id*.

Mangual insists that the ALJ erred by failing to include her neuropathy as a severe impairment, and by failing to include all her impairments in the RFC. The record makes clear that she does suffer from type II diabetes mellitus, diabetic neuropathy, and hypoesthesia in her feet, which has been confirmed by monofilament testing. (ECF No. 10, pp. 335-342, 344-354, 375-376, 386-387, 448-451, 456-459, 581-582, 724-731). Numbness, burning, and pain in the feet are among her reported symptoms. Despite prescriptions for Gabapentin and Lyrica, her physical exams have remained unchanged.

In addition to neuropathy, Mangual also suffers from DDD of the lumbar and cervical spine. MRIs showed a small central disk protrusion at the C5-6 level, disk desiccation with bulge at the L2-3 and L3-4 levels with mild narrowing of the foramen at the L2-3 level and a small Tarlov cyst on the right side at the S2 level. (ECF No. 10, pp. 254-255, 262, 279-280, 320-322, 343, 345, 426-428, 452, 454, 532-535, 584-586, 638-640). Records indicate that she failed physical therapy, chiropractic treatment, medication management, trigger point injections, CESIs, medial branch blocks, and most recently, CFSIs. (*Id*. at 327-330, 339-342, 357-360, 377-378, 466-469, 479-482, 495-517, 690-692, 719-721, 768-772). Although she did receive some short-term relief from each treatment modality, nothing has provided her with reliable long-term pain relief.

In August 2020, Mangual's treating physician, Dr. Charles Craft, opined that she was limited to standing and walking for one hour each per day with extra breaks and a sit/stand at will

option. (ECF. No. 10, pp. 776-779). Function and pain reports, as well as treatment notes, are also replete with reports of her inability to stand and walk for long periods of time. (*Id*. at 172-183, 184-191, 201-202, 211-218, 495-517). Although the Plaintiff did initially report the ability to prepare full meals, as her ability to function deteriorated, she also reported a decrease in her ability to cook and clean, noting that she needed assistance to do so. (*Id*. at 211-218). And it is true that she reported the ability to attend church and her children's school activities; however, there is no evidence to suggest that any of these activities required lengthy standing or walking.

The ALJ found Mangual's neuropathy to be a non-severe impairment because there are no nerve conduction studies to confirm the diagnosis. (ECF No. 10, p. 17). Although nerve conduction studies and an electromyogram are often used to diagnose neuropathy, they are not the only tests available. The monofilament test is often the first line of screening for diabetic peripheral neuropathy in the feet. *See* Mayo Foundation for Medical Education and Research, *Diabetic Neuropathy*, at https://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/diagnosis-treatment/drc-20371587 (last accessed June 9, 2023). And, as previously mentioned, monofilament testing consistently confirmed Mangual's allegations of neuropathy.

Further, contrary to the ALJ's contention that Mangual's ability to walk without assistance undermines her allegations of neuropathy, we note that pain, burning, and diminished sensation in the feet is not always evident in an individual's gait. Rather, this discomfort generally predisposes them to stand and walk for shorter periods to mitigate these symptoms.

The ALJ also gave Dr. Craft's assessment little weight because he allegedly "based his opinions on a treatment history back to 2015 and imaging but did not specifically cite imaging or exams he relied on for his opinions." (ECF No. 10, p. 23). There is no indication, however, that Dr. Craft relied on treatment notes from 2015 to render his opinion. Rather, he opined that his

assessment dated back to 2015. And, he pointed to her treatment notes, history, exam findings, and imaging studies as support for his assessment. As the overall record supports his assessment, he was not required to identify specific treatment notes or images to support his opinion.

For these reasons, the undersigned does not find substantial evidence to support the ALJ's determination that the Plaintiff can perform light work with occasional overhead reaching, use of ramps/stairs/ ladders/ropes/scaffolds, balancing, stooping, kneeling, crouching, and crawling and work involving simple, routine, repetitive tasks. Based on her combination of impairments, it is reasonable to conclude that Mangual would be unable to stand and walk for six hours per workday as is required of light work.

Accordingly, it is recommended that the case be remanded to the ALJ for further consideration of the Plaintiff's RFC. To aid him in rendering a decision on remand, the ALJ should be directed to obtain medical source statements from Plaintiff's treating pain specialist. If said specialist is unable or unwilling to provide an assessment, the ALJ should be ordered to obtain a consultative neurological evaluation of the Plaintiff, complete with an RFC providing insight into the Plaintiff's ability to sit, stand, and walk.

### IV.   Conclusion

Based on the foregoing, it is recommended that the Commissioner's decision denying benefits be reversed and the case be remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties**

**that objections must be both timely and specific to trigger de novo review by the district court.**

 DATED this 14th day of June 2023.

         /s/ Mark E. Ford
         HON. MARK E. FORD
         CHIEF UNITED STATES MAGISTRATE JUDGE